

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Giovani Rodríguez Vélez y su Esposa Gidalsy Rivera Hernández y la Sociedad Legal de Gananciales compuesta por ambos<br><br>Peticionarios<br><br>v.<br><br>Bahía Park, S.E.; Carlos García Muñiz y su esposa Fulana de Tal y la Sociedad Legal de Gananciales compuesta por ambos, personalmente y como socios de Bahía Park, S.E., los demás socios actualmente desconocidos de Bahía Park, S.E.; Denominados Provisionalmente X, Y y Z<br><br>Recurridos | Certiorari<br><br>2010 TSPR 226<br><br>180 DPR ____ |

Número del Caso: CC-2008-518

Fecha: 14 de diciembre de 2010

Tribunal de Apelaciones:

      Región Judicial de Superior, Panel VI, Especial

Juez Ponente:

      Hon. Lourdes Velázquez Cajigas

Abogados de la Parte Peticionaria:

      Lcdo. Juan Carlos Pou

Abogados de la Parte Recurrida:

      Lcdo.Juan A. Moldes Rodríguez

Materia: Incumplimiento de Contrato, Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Giovani Rodríguez Vélez y su esposa Gidalsy Rivera Hernández y la Sociedad Legal de Gananciales compuesta por ambos<br><br>        Peticionarios<br><br>               v.<br><br>Bahía Park, S.E.; Carlos García Muñiz y su esposa Fulana de Tal y la Sociedad Legal de Gananciales compuesta por ambos, personalmente y como socios de Bahía Park, S.E., los demás socios actualmente desconocidos de Bahía Park, S.E.; Denominados Provisionalmente X, Y y Z<br><br>        Recurridos | CC-2007-518 |
|---|---|

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 14 de diciembre de 2010.

La parte peticionaria, el Sr. Giovanni Rodríguez Vélez, su esposa Gidalsy Rivera Hernández y la sociedad legal de gananciales compuesta por ambos, nos solicitan la revisión de un dictamen del Tribunal de Apelaciones que confirmó una sentencia del Tribunal de Primera Instancia, Sala Superior de San Juan, en la que se desestimó una demanda de daños y perjuicios e incumplimiento de contrato. Mediante dicha sentencia, el foro primario acogió una moción de sentencia sumaria presentada por Bahía Park S.E. (Bahía Park), en la que se aseguró que el contrato de corretaje, de tipo abierto,

que se alegaba existía entre las partes, era nulo por carecer de fecha de vencimiento, contrario a lo que exige el Artículo 31, inciso 9, de la Ley Núm. 10 de 26 de abril de 1994, 20 L.P.R.A. sec. 3054(9), conocida como la Ley para Reglamentar el Negocio de Bienes Raíces en Puerto Rico (Ley Núm. 10).

Para resolver este caso tenemos que interpretar el Artículo 31, inciso 9, de la Ley Núm. 10 para determinar si todos los contratos de corretaje deben tener fecha de vencimiento. Luego de realizar un detenido análisis, resolvemos que todos los tipos de contrato de corretaje deben tener fecha de vencimiento, conforme a la intención legislativa de la Ley para Reglamentar el Negocio de Bienes Raíces en Puerto Rico. También resolvemos en cuáles circunstancias un corredor de bienes raíces tiene derecho a recibir compensación cuando la compraventa se perfeccionó luego de estar vencido el contrato de corretaje.

I

En febrero de 1998, el señor Rodríguez Vélez era empleado de Masterlite Product, Inc. (Masterlite) y Corredor de bienes raíces con licencia. En Masterlite, el señor Rodríguez Vélez conoció al Sr. Carlos García Muñiz, accionista de esa entidad y dueño de la entidad comercial Bahía Park. En una reunión, García Muñiz le indicó a Rodríguez Vélez que Bahía Park había adquirido unos terrenos en el área de Cataño y que tenía la intención de

venderlos. Al poco tiempo, el señor Rodríguez Vélez cesó en sus funciones en Masterlite y continuó ejerciendo como corredor independiente de bienes raíces.

En marzo del 1998, el señor Rodríguez Vélez se enteró de que Supermercados Amigo necesitaba una finca para relocalizar sus almacenes generales. Por tal razón, coordinó una reunión con el señor García Muñiz para ver si Bahía Park aún interesaba vender la finca que había adquirido en el Municipio de Cataño. El señor Rodríguez Vélez le proveyó información relacionada a lo que había escuchado y le preguntó si interesaba que él realizara algún acercamiento a Supermercados Amigo con relación a la finca. El señor García Muñiz aceptó y llegó a unos acuerdos preliminares con el corredor Rodríguez Vélez.

Como resultado de lo anterior el señor Rodríguez Vélez redactó una carta el 17 de marzo de 1998, en la que alegadamente recopiló los acuerdos llegados hasta ese momento. Dicha carta indicaba lo siguiente:

> Según conversación que mantuviéramos en las pasadas semanas en su oficina, le informo que en relación a la posible venta de la finca de 22.37 cuerdas radicada en el Sector Industrial Bahía de Cataño, Puerto Rico, estamos manteniendo negociaciones con el licenciado Luis Colón Martínez, representante de Supermercados Amigo. Hasta el momento estos clientes se han mantenido positivamente interesados en la propiedad.
>
> Aprovecho la oportunidad para confirmar los acuerdos que habíamos tenido anteriormente.
>
> -El precio de venta en terreno utilizable será de sesenta dólares ($60.00) por metro cuadrado,

–El precio de venta en terreno no utilizable (wetland) será de diez dólares ($10.00) por metro cuadrado,
–La comisión a ser pagada será de cinco porciento (5.0%) del precio de venta total.

Próximamente estaremos coordinando una reunión en sus oficinas para discutir los detalles de la negociación con amplitud.

El señor Rodríguez Vélez coordinó una visita a la finca de Cataño para varios representantes de Supermercados Amigo. Éstos demostraron tener interés en la propiedad, pero le indicaron que "la determinación final de adquirirla le correspondería a la Junta de Directores de Supermercados Amigo". Incluso, el corredor expuso en su deposición que "las personas que yo llevé no dependían de ellos para tomar la decisión sino que tenían que ir entonces donde una Junta de Directores que aprobara y ese tipo de cosas". Posteriormente, el señor Rodríguez Vélez realizó varias llamadas de seguimiento, sin éxito, a los representantes del supermercado.

Por otra parte, el entonces abogado de Supermercados Amigo, Lcdo. Luis A. Avilés Pagán, quien había fungido de 1995 a 1998 como representante legal de Bahía Park, fue el que se encargó de llevar a la atención de la Junta de Directores de Supermercados Amigo (Junta), el 4 de mayo de 1999, la disponibilidad de los terrenos del señor García Muñiz. El licenciado Avilés Pagán advino en conocimiento de la existencia de los terrenos por el tiempo que colaboró con el señor García Muñiz en Bahía Park.

La Junta estaba evaluando la viabilidad de unos terrenos en Caguas para establecer un almacén central. Fue entonces cuando el licenciado Avilés Pagán solicitó y obtuvo autorización para consultar con el Lcdo. Ricardo Muñiz, abogado de Bahía Park y su antiguo compañero de trabajo, si los terrenos de Cataño seguían disponibles. Ambos representantes legales notificaron al señor García Muñiz el interés de Supermercados Amigo en la finca. Según la parte recurrida "[f]ue en virtud de la comunicación generada entre dichos representantes legales que en junio 1999, Bahía Park y Supermercados Amigo, Inc. suscribieron un contrato de opción para la compra de estos terrenos y el 23 de noviembre de 1999, suscribieron la escritura de compraventa de los mismos". La escritura de compraventa fue por la cantidad de $5,847,925.50.

Así pues, a finales de 2001, el señor Rodríguez Vélez se enteró de que Supermercados Amigo había comprado los terrenos a Bahía Park. El señor Rodríguez Vélez reclamó la comisión de la compraventa al señor García Muñiz, quien le indicó que no le pagaría por no haber sido el promotor de la venta final. El 16 de abril de 2002, el señor Rodríguez Vélez presentó ante el Tribunal de Primera Instancia una demanda por incumplimiento de contrato y daños y perjuicios contra Bahía Park, el señor García Muñiz, su esposa y la sociedad legal de bienes gananciales compuesta por ambos. Solicitó que los demandados pagaran la comisión de la compraventa de los

terrenos de Cataño a razón de 5% del precio de venta, equivalente a una suma de $250,000.00. A esos efectos, alegó que había sido él quien había llevado a los representantes de Supermercados Amigo a ver el terreno por primera vez y que conforme a los acuerdos verbales, ratificados en la carta del 17 de marzo de 1998, tenía derecho a recibir retribución por esa venta. Finalmente solicitó $100,000.00 en concepto de daños.

La parte recurrida contestó la demanda y señaló que los acuerdos que había hecho con el señor Rodríguez Vélez eran todos preliminares; que estipularon una comisión de un 4% del precio de venta; que ese acuerdo no sería un contrato de servicios con carácter exclusivo sino uno de tipo abierto; y que vencería a los seis meses. Explicó que desde marzo de 1998 hasta finales del 2001, el señor Rodríguez Vélez no se había comunicado con él y que entendió que el contrato había expirado catorce meses antes de otorgarse la compraventa.

Como defensa afirmativa la parte recurrida señaló que el señor Rodríguez Vélez incumplió con el Artículo 31, inciso 9, de la Ley Núm. 10. Allí se establece que el corredor debe explicar al cliente en qué consiste el acuerdo y exponer cuál es la fecha de su vencimiento. Además, la parte recurrida alegó que la carta de 17 de marzo de 1998 no era un contrato, pero que, aunque el tribunal entendiera que lo era, no se trababa de un contrato exclusivo, por lo que nada impedía que otro

corredor o ella misma intentara vender el bien. También explicó que el alegado contrato carecía de fecha de vencimiento, por lo que conforme a la Ley Núm. 10 era nulo.

Tras varios trámites procesales, el 13 de agosto de 2004 Bahía Park y el señor García Muñiz presentaron una solicitud de sentencia sumaria. Según ellos, "la parte demandante basa su reclamación en una comunicación redactada por el codemandante Giovanni Rodríguez, fechada el 17 de marzo de 1998, en la que pretendió confirmar los términos de un contrato de corretaje con Bahía Park, S.E.". Adujeron que dicha comunicación no tenía fecha de vencimiento por lo que, de ser un contrato de corretaje, éste sería nulo al amparo del Artículo 31, inciso 9, de la Ley Núm. 10. A tales efectos, manifestaron que dicha ley fue enmendada por la Ley Núm. 271 de 6 de octubre de 1998, para prohibir las cláusulas de renovación automática en todos los contratos de corretaje, con la intención de eliminar así la incertidumbre acerca de la extensión de esos contratos. En fin alegaron que todos los contratos de corretaje requieren fecha de vencimiento.

Es oportuno señalar que la solicitud de sentencia sumaria incluyó, a manera de ilustración, dos contratos redactados por el señor Rodríguez Vélez, contemporáneos a las conversaciones con Bahía Park, que contenían fecha de vencimiento y establecían los eventos que condicionaban

el pago de la comisión. Por ejemplo, uno de esos contratos mencionaba que si se vendía el terreno luego de seis meses de vencido el contrato a una persona con la que el corredor hubiese negociado, el cliente tenía que pagar la comisión. Nada de lo anterior surgía de la carta del 17 de marzo de 1998. El estimado contrato estaba huérfano de expresiones sobre ese particular y no contemplaba disposición de extensión alguna.

Además, los recurridos señalaron que los esfuerzos realizados por el corredor Rodríguez Vélez no fueron suficientes para alcanzar la venta. Incluso, éstos aseguraron que sus gestiones se limitaron a una reunión y siete llamadas telefónicas, de las cuales la más larga duro tres minutos, y que casi todas fueron con la secretaria personal del Secretario de la Junta de Directores de Supermercados Amigo. La parte recurrida alegó que la labor del señor Rodríguez Vélez no llevó a que la compraventa se realizara y él no fue el promotor de la transacción. Reiteró que la compraventa se completó gracias a los trámites y esfuerzos de los representantes legales de ambas empresas mucho más de un año después de la intervención del señor Rodríguez Vélez.

El 6 de octubre de 2004, el señor Rodríguez Vélez se opuso a la sentencia sumaria y alegó que el contrato de corretaje era de tipo abierto, lo cual le excluía de la aplicación del Artículo 31 de la Ley Núm. 10. Explicó que el referido artículo prohíbe, en el inciso 9, concretar

un contrato de corretaje "exclusivo o semiexclusivo, sin explicar los términos y condiciones del mismo, y su fecha de vencimiento". Art. 31 (9), supra. Explicó que existen diversos tipos de contratos de corretaje y que en Puerto Rico se aceptan en la práctica los exclusivos, semiexclusivos y abiertos. También señaló que el legislador quiso que los contratos de corretaje de tipo abierto no vinieran obligados a tener término fijo. En último lugar, alegó que no procedía emitir sentencia sumaria porque existían controversias de hechos importantes por dilucidar, como por ejemplo, el porcentaje de la comisión y si el contrato tuvo un término de vencimiento de seis meses. El señor Rodríguez Vélez indicó que aunque esos elementos ponían en controversia la existencia de un contrato y sus términos, era indiscutible que él fue el primero que llevó a los representantes de Supermercados Amigo a ver los terrenos, y eso le hacía acreedor de la comisión. El señor Rodríguez Vélez explicó que en los contratos de corretajes abiertos se le paga la comisión al primer agente que encuentre un inquilino cualificado. Anejó a la oposición: (1) parte de la deposición del señor García Muñiz, en la que éste habló de un término de seis meses para firmar la escritura de compraventa; y (2) parte de su deposición, en la que aseguró que no concretó una fecha de vencimiento.

La parte recurrida presentó una réplica a la moción en oposición, en la que negó que hubiese una controversia de hechos medulares que impidiera disponer del caso. Indicó que solamente restaba por resolver si el alegado contrato de corretaje era nulo por carecer de fecha de vencimiento, lo cual era un argumento de derecho. A esos efectos, expuso que el inciso 9 del Artículo 31 se enmendó para incluir "que no serán permitidas las cláusulas de renovación automática en los contratos de corretaje". Expuso que como el legislador prohibió las renovaciones automáticas en todos los contratos de corretaje, éstos tienen que tener fecha de vencimiento. Además, argumentó que los contratos de tipo abierto no pueden tener una vigencia a perpetuidad, ya que el corredor adquiriría así un derecho a cobrar una comisión de cada persona que interactuó con él con relación a la propiedad, independientemente del tiempo que haya transcurrido y los esfuerzos realizados. A su juicio, eso es irrazonable.

El Tribunal de Primera Instancia emitió sentencia sumaria en la que acogió los argumentos de Bahía Park y del señor García Muñiz. Entendió que no estaba en controversia que las partes realizaron un acuerdo no exclusivo y que la demanda se basaba en la carta del 17 de marzo de 1998, la cual no tenía fecha de vencimiento. El foro primario utilizó la Exposición de Motivos de la Ley Núm. 271 para sustentar que todos los contratos de

corretaje, no solamente los exclusivos o semiexclusivos, tienen que tener fecha de vencimiento. Concluyó que el contrato del 17 de marzo de 1998 es nulo y el corredor no tiene derecho a cobrar la comisión, por lo que desestimó la demanda.

Inconforme, el peticionario Rodríguez Vélez acudió al Tribunal de Apelaciones y alegó que existía controversia de hechos que impedía disponer del caso mediante el mecanismo de sentencia sumaria. Explicó que no era de aplicación el inciso 9 del Artículo 31 de la Ley Núm. 10, ni su enmienda, ya que allí no se mencionan expresamente los contratos de corretaje abiertos. Señaló, además, que los contratos de corretaje se rigen por la figura del mandato, por lo que su extinción queda a la prerrogativa del mandante. Alegó que en los contratos abiertos se le otorga la comisión al primer corredor que consiga a una persona cualificada y que el término de duración está en manos del cliente.

El Tribunal de Apelaciones confirmó la determinación del foro primario. Indicó que únicamente para efectos de emitir la sentencia sumaria, la parte recurrida, Bahía Park, aceptó que la carta del 17 de marzo de 1998 era el contrato de corretaje y que ambas partes estaban de acuerdo en que éste no tenía fecha de vencimiento. El tribunal aclaró que la Ley Núm. 271 no le era de aplicación al contrato del caso de autos por ser posterior a la enmienda. Sin embargo, entendió que esa

ley debía considerarse por tratarse de la última expresión de la Asamblea Legislativa, la cual buscaba prohibir que todo tipo de contrato de corretaje tuviera una duración indefinida. El foro intermedio indicó que la Exposición de Motivos de la enmienda señala que la Ley Núm. 10 le requiere al corredor explicar el contrato al cliente y su fecha de vencimiento, lo que no ocurrió en este caso. Además, el tribunal razonó que la intención legislativa era incluir todo tipo de contrato de corretaje.

El 7 de junio de 2007, el peticionario Rodríguez Vélez acudió ante nosotros y señaló los mismos errores levantados ante el Tribunal de Apelaciones. Es decir, nos requiere que resolvamos si el contrato de corretaje abierto es nulo por no haberse fijado la fecha de vencimiento. Asimismo argumenta que no procedía dictar la sentencia sumaria porque existía controversia de hechos sobre el término del contrato y la comisión a pagar. Además, la parte peticionaria expone que, de aplicar el Artículo 31, inciso 9, al contrato de autos, el hecho de que la parte recurrida alegara que tenía fecha vencimiento de seis meses, subsanaba la carencia de término. Sostiene que lo importante es quién enseñó la finca primero a los representantes de Supermercados Amigo, independientemente de que el término del contrato de corretaje hubiera expirado.

Expedimos el auto de *certiorari* el 10 de agosto de 2007. Procedemos a resolver luego de examinar los alegatos de las partes.

II

Como cuestión preliminar debemos determinar si es válido un contrato de corretaje que no tiene fecha de vencimiento.

En el presente caso, la parte recurrida aceptó para efectos de la solicitud de sentencia sumaria que la carta del 17 de marzo de 1998 fuera considerada como el contrato de corretaje. Por tal razón, la controversia se limitó a resolver si ese contrato es nulo por ser contrario a la Ley Núm. 10 al no contener fecha de vencimiento. La parte peticionaria argumentó que, la Ley Núm. 10 no aplica al contrato de corretaje de tipo abierto y que el derecho de los mandatos debía regir la controversia. Debido a la discusión generada sobre el alcance de esa ley, es preciso que nos expresemos sobre este particular.

Como se sabe, el Artículo 14 del Código Civil de Puerto Rico, 31 L.P.R.A. Sec. 14, dispone que "cuando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". En virtud de lo anterior, al interpretar un estatuto debemos remitirnos inicialmente al texto de la ley cuando el legislador se ha manifestado en un lenguaje claro e inequívoco. El texto de la ley es

la expresión por excelencia de toda la intención legislativa. Romero Barceló v. E.L.A., 169 D.P.R. 460, 476, (2007); Irizarry v. J & J Cons. Prods. Co. Inc, 150 D.P.R. 155 (2000). Conforme a lo anterior, si una ley es clara y no produce ambigüedad no hay necesidad de buscar más allá de su letra. Departamento de Hacienda v. Telefónica, 164 D.P.R. 195 (2005).

Ahora bien, cuando el estatuto es confuso, es deber del Tribunal llenar las lagunas que hubiese y armonizar aquellas disposiciones que estén o parezcan estar en conflicto. P.P.D. v. Gobernador, 111 D.P.R. 8, 13 (1981). Cónsono con ello, el Artículo 17 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 17, establece que cuando las palabras de una ley son dudosas, su sentido debe ser buscado por el examen y comparación de las frases dudosas con otras palabras y sentencias que les estén relacionadas, en el orden de una buena investigación para llegar a su verdadero significado. El ejercicio de la interpretación estatutaria requiere que indaguemos la intención legislativa a través del análisis del historial legislativo de la ley, su exposición de motivos, de los diversos informes de las comisiones de las cámaras o de los debates celebrados en el hemiciclo. Ortiz v. Municipio San Juan, 167 D.P.R. 609, 617 (2006); Vicenti v. Saldaña, 157 D.P.R. 37 (2002).

Asimismo, el Artículo 19 del Código Civil, 31 L.P.R.A. sec. 19, expone que el medio más eficaz y

universal para descubrir el verdadero sentido de una ley en caso de duda, es "considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla". Col. Int'l Sek P.R., Inc. v. Escribá, 135 D.P.R. 647, 660 (1994). En Zambrana Maldonado v. E.L.A., 129 D.P.R. 740, 749 (1992), expresamos que "el análisis de la ley debe hacerse teniendo en mente los fines que ésta persigue y de forma tal que la ley se ajuste a la política pública que la inspira". También indicamos que en el proceso de interpretación no debemos desvincular la ley del problema que intenta solucionar. Id. Tenemos el "deber de hacer que el derecho sirva propósitos útiles y evitar una interpretación tan literal que lleva a resultados absurdos". Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 409 (1988). En fin, la ley se debe interpretar de la forma que más se ajuste a la intención de la Asamblea Legislativa. Asoc. Médica de P.R. v. Cruz Azul. 118 D.P.R. 669, 676 (1987); Col. Int'l Sek P.R., Inc. v. Escribá, supra.

Por último, debido a que las leyes y reglas no pueden prever todas las situaciones, es lógico que la jurisprudencia llene las lagunas del derecho positivo. Ello no debe caer en la libre legislación casuística. Rivera Rivera v. Comisión Industrial, 103 D.P.R. 51, 58 n.3 (1974). A la luz de las reglas de hermenéutica legal

antes esbozadas, pasamos a resolver la controversia en cuestión.

Conforme a la práctica de Bienes Raíces existen tres tipos de contratos de corretaje, a saber, los exclusivos, semiexclusivos y los abiertos. Véase, D. Barlow Burke. Jr., Law of Real State Brokers, Third Edition, Aspen Publishers, 2009, § 2.02 [A-C], págs. 2.24-2.49. El contrato de corretaje exclusivo es aquel mediante el cual el cliente "le concede al corredor o empresa de bienes raíces la autorización única y exclusiva para actuar como intermediario en representación de éste para ofrecer, promocionar y negociar determinada transacción de bienes raíces. Este tipo de contrato limita la competencia y participación de otros corredores o empresas de bienes raíces en la gestión de corretaje, así como la capacidad del propietario de perfeccionar por sí mismo la transacción de bienes raíces". R. Cintrón Perales, El Contrato de Corretaje de Bienes Raíces y Opción de Compraventa de Propiedades Residenciales, San Juan, Puerto Rico, Edic. Situm, 2006, págs. 87-88. En el contrato semiexclusivo, contrario al exclusivo, el dueño "no renuncia a su facultad de realizar gestiones para perfeccionar la transacción de bienes raíces por sí mismo". Cintrón Perales, op cit., pág. 87.

Finalmente, en los contratos de corretaje abiertos, como el que nos ocupa, el cliente "se reserva la facultad de contratar el número de corredores que desee. El

derecho de exigir el pago de la comisión será de aquel corredor que haya sido quien procuró que se perfeccionara la transacción de bienes raíces (procuring cause)". Cintrón Perales, op cit., págs. 88-89. Cuando el contrato de corretaje no establece el tipo, se presumirá abierto. D. Barlow Burke. Jr., op cit., § 2.02, pág. 2.25. Este tipo de contrato de corretaje es el más informal. Se conoce por no ser de carácter exclusivo. De ordinario, lo utilizan los vendedores que intentan vender por su cuenta su propiedad, pero que están dispuestos a darle la oportunidad a un corredor a que intente venderla primero. Generalmente el corredor acuerda que será acreedor de la comisión al perfeccionarse la venta. Id., págs. 2.24-2.25.

La Ley Núm. 10 no contempla ni define esos tres tipos de contratos de corretaje. Sin embargo, dispone en el Artículo 31, inciso 9, que está prohibido por un corredor de bienes raíces "realizar con cualquier parte un **contrato de corretaje exclusivo o semi exclusivo**, **sin explicarle los términos y condiciones del mismo, y <u>su fecha de vencimiento</u>**; Disponiéndose, que **no serán permitidas las cláusulas de renovación automáticas <u>en los contratos de corretaje</u>**". (Énfasis y subrayado suplidos). Originalmente y a la fecha de la suscripción del contrato de autos, la Ley Núm. 10 solamente mencionaba que se prohibía a toda persona sujeta a las disposiciones de la ley "realizar con cualquier parte un contrato de

corretaje exclusivo o semi exclusivo, sin explicarle los términos y condiciones del mismo y su fecha de vencimiento". Art. 31(9), 20 L.P.R.A. sec. 3054.

Es debido a la utilización de los términos exclusivo o semiexclusivo en el Artículo 31, inciso 9, que la parte peticionaria sostiene que la Asamblea Legislativa estaba utilizando la terminología técnica de la profesión y excluyendo implícitamente a los contratos de corretaje de tipo abierto. Por otra parte, los recurridos alegan que, a base de ese artículo y el propósito de la ley, todos los contratos de corretaje deben tener fecha de vencimiento o serán nulos. Entienden que el texto antes citado no tuvo la intención específica de omitir algún tipo de contrato de corretaje y que establece una obligación general. Incluso, no define los tipos de contrato de corretaje. Por consiguiente, una de las controversias que nos ocupan es si la Ley Núm. 10, Artículo 31, inciso 9, exige que todos los contratos de corretaje tengan fecha de vencimiento; o si el contrato de corretaje abierto está excluido.

La polémica se acentúa al considerar que, luego de suscrito el acuerdo entre las partes, el legislador enmendó el Artículo 31, inciso 9, de la Ley Núm. 10 a fin de prohibir las cláusulas de renovación automática en todos los contratos de corretaje. A tales efectos, incluyó el siguiente lenguaje: "Disponiéndose, que no serán permitidas las cláusulas de renovación automáticas

en **los contratos de corretaje**". (Énfasis Suplido). Los recurridos aseveran que en la Exposición de Motivos de dicha enmienda, la Asamblea Legislativa implica que la Ley Núm. 10 ya exigía que todos los contratos de corretaje tuvieran término o fecha de vencimiento. Es lógico que al prohibir la renovación automática de todos los contratos de corretaje, se implica que todos tienen que tener una fecha de vencimiento.  Ello, sin duda, incluiría a los contratos de corretaje de tipo abierto.

Francamente, el lenguaje del Artículo 31 inciso 9, es confuso, ya que no deja claro si el legislador quería prohibir que los corredores de bienes raíces contrataran sin explicar los términos del contrato, incluyendo la fecha de vencimiento o si su interés era que, tales contratos siempre tuvieran fecha de vencimiento. Pese a que el lenguaje parece sencillo, no queda claro cuál era el interés o la prohibición que la Asamblea Legislativa procuró al redactar la ley. Cabe señalar que nunca antes hemos interpretado este artículo aunque requiere aclaración.

La Asamblea Legislativa aprobó la Ley Núm. 10 con la intención de agrupar todas las disposiciones legales que estaban en vigor, en aquel momento, para la industria de las Bienes Raíces. Con su aprobación se derogaron: la Ley Núm. 139 de 14 de junio de 1980, conocida como la "Ley para Reglamentar la Profesión de Corredor de Bienes Raíces en Puerto Rico" (Ley Núm. 139); la Ley Núm. 145 de

18 de junio de 1980, conocida como la "Ley para Reglamentar la Venta en la Isla de Bienes de Raíces Localizados fuera de Puerto Rico" (Ley Núm. 145); y los Reglamentos de Competencia Justa Números IV y V del Departamento de Justicia Asuntos Monopolísticos.

Del Diario de Sesiones de la Cámara de Representantes emana que fueron recogidas en la Ley Núm. 10 algunas prácticas proscritas por los corredores y contenidas en la Ley Núm. 145. Allí, el Hon. Angel Cintrón García explicó que incluyó la Ley Núm. 145 "y se recoge gran parte de esa ley, y se coloca **aquí como prácticas proscritas, y se es bien específico, y se defiende cabalmente al consumidor puertorriqueño…**". (Énfasis suplido). Diario de Sesiones de la Cámara de Representante de Puerto Rico, Debate sobre el P. del S. 300 de 11 de abril de 1994, pág. 172.

Asimismo, el representante Cintrón García indicó que:

> De las leyes que se derogan, una, que es de la autoría de Misla Aldarrondo del año '80, y una de la autoría del señor Navarro Alicea, del año '80, ambos aquí presentes—quiere decir que es legislador hace mucho tiempo—están ambas englobadas **prácticamente casi ad verbatim en esta nueva ley, por eso es que hay más de ocho páginas de la ley que era del compañero Navarro Alicea [entiéndase, la Ley Núm. 145],** porque lo que se hace es consolidar el ejercicio en un[a] sola ley, y se recogió todo lo que estaba disperso en años anteriores para que los compañeros tengan la tranquilidad de que la intención legislativa y la efectividad que han tenido por año[s] esas dos leyes, la 139 y 145, de ninguna manera se afecta ni se pierde, sino

que se consolida en un solo ejercicio. (Énfasis Suplido).

Diario de Sesiones de la Cámara de Representantes de Puerto Rico, Debate sobre el P. del S. 300 de 11 de abril de 1994, pág. 177.

Puesto que gran parte del contenido de la Ley Núm. 145 fue incluido en la Ley Núm. 10 como prácticas proscritas, es decir, como parte del Artículo 31, entendemos pertinente evaluar el contenido del estatuto derogado. La Ley Núm. 145 buscaba regular la proliferación de corredores o instituciones de bienes raíces que realizaban contratos de corretaje y venta en Puerto Rico sobre terrenos en el estado de la Florida. Dicha ley contenía un amplio número de restricciones dirigidas a que el cliente del corredor de bienes raíces estuviera bien informado y supiera específicamente el alcance del contrato que estaba firmando. Además, se buscaba que el cliente conociera con certeza qué era lo que estaba comprando.

El Artículo 8, inciso (l)(3), de la Ley Núm. 145 prohibía en la actividad de una oferta de venta o venta en Puerto Rico de bienes inmuebles fuera de la isla un contrato de venta sin detallar **"el término de duración de dicho contrato,** incluyendo específicamente **<u>la fecha de vencimiento</u>"** (énfasis suplido). Ese es el único lenguaje dirigido a establecer un interés particular del legislador en que el cliente conozca el término de vigencia del contrato.

Ahora bien, la Ley Núm. 145 no es el único estatuto incorporado al contenido de la Ley Núm. 10, que enfatiza los deberes del corredor de bienes raíces y la necesidad de mantener informado al cliente de los términos del contrato. La Exposición de Motivos de la Ley Núm. 139 mencionaba que es "necesario que se provean unos mecanismos que le garanticen al pueblo un servicio competente y confiable...". Asimismo, el Reglamento V de Competencia Justa establecía actos y prácticas proscritas a vendedores y corredores en general con el ánimo de proteger al consumidor. Hemos notado que del Reglamento V es que surge la mayor parte del contenido del Artículo 31 de la Ley Núm. 10, ya que algunos incisos son prácticamente similares.

El Artículo V, inciso 23, del Reglamento V, prohibía "concertar con cualquier cliente un contrato autorizando que el corredor o vendedor actué como el **agente exclusivo en la venta de dicha propiedad sin antes informar al cliente sobre el alcance de la exclusividad**". (énfasis suplido). Éste es el único lenguaje en ese reglamento relacionado al deber del agente en caso de realizar acuerdos con exclusividad y la función de mantener informado al cliente. De igual forma rezaba el inciso 19 de la derogada Ley Núm. 77 de 25 de mayo de 1978, para Reglamentar la Profesión de Bienes Raíces en Puerto Rico, recogido en el Reglamento V. El inciso 9 del Artículo 31 de la Ley Núm. 10, supra, parece ser el producto de la

unión del contenido del Artículo 8, inciso (l) (3) de la Ley Núm. 145 y las expresiones del Artículo V, inciso 23, del Reglamento V de Competencia Justa.

Consideramos que las leyes agrupadas y derogadas por la Ley Núm. 10 hacen énfasis en que los clientes tengan conocimiento del alcance y el término del contrato. La Ley Núm. 10 no hace distinción entre tipos de contrato de corretaje. Sin duda, es un factor común de todas las leyes que cobijaban esta materia la intención de proteger al consumidor de prácticas deshonestas de los corredores de bienes raíces e instituciones que se dedican a esos fines. De hecho, esa fue la política pública que se reconoció en la Ley Núm. 10.

Esa ley establece un ordenamiento especial para reglamentar el negocio de bienes raíces relacionadas a propiedades en y fuera de Puerto Rico. Todo ello, se debe a la naturaleza de las funciones del corredor de bienes raíces y la importancia que tiene éste en la compra y venta de inmuebles. Exposición de Motivos de la Ley Núm. 10, Leyes de Puerto Rico 1994, pág. 43-44. Con el objetivo de proteger a los consumidores, la Ley Núm. 10 dispuso un nuevo y más estricto cuerpo reglamentario de los vendedores, corredores o empresas de bienes raíces. Id; Vélez v. Izquierdo, 162 D.P.R. 88, 95 (2004).

Durante el debate de la Cámara de Representantes para la aprobación de la Ley Núm. 10 se recalcó la naturaleza delicada de los intereses de los consumidores.

En particular, se mencionó que no era un asunto sencillo reglamentar una profesión que maneja las transacciones de bienes inmuebles que "probablemente en las familias puertorriqueñas, son el único activo que tiene nuestras familias, especialmente las de clase media y humilde". Diario de Sesiones de la Cámara de Representantes de Puerto Rico, Debate sobre el P. del S. 300 de 11 de abril de 1994, pág. 169. Además, se enfatizó en que algunas de las leyes que quedarían derogadas, como la Ley Núm. 145, atendían situaciones que habían afectado a muchos consumidores puertorriqueños y que ese aspecto debía mantenerse en la nueva ley. Con ello, se otorgaron los ejemplos de corredores que vendían terrenos de la Florida en Puerto Rico de manera fraudulenta y la venta de viviendas con amplios defectos de construcción conocidas por los desarrolladores. Más aún, se habló de casos de personas que no se dedican a la industria pero que servían como corredores, engañando a los consumidores. Id., págs. 173-175.

Debido a la importancia de esta legislación, su texto fue examinado en varias ocasiones antes de su aprobación. En la primera versión del P. del S. 300, el Artículo 31 de actos y prácticas proscritas, inciso 21, establecía que quedaba prohibido al corredor "[c]oncertar con cualquier cliente un contrato de corretaje exclusivo o semi exclusivo, sin explicarle sobre el alcance de esta exclusividad o semi exclusividad o no indicar en dicho

contrato la fecha de expiración del mismo". Como se puede apreciar, ese inciso es muy similar a lo que establecía el Reglamento V y la Ley Núm. 145. No fue hasta la segunda sesión ordinaria de 1993 que se concretó el lenguaje del Artículo 31, con el que se aprobó la ley. De lo anterior surge que la Ley Núm. 10 y sus antecesoras fueron concertadas con la intención de proteger al consumidor y fomentar que éste estuviera bien informado al comprometerse contractualmente con el corredor. Ello se desprende de casi todo el debate del P del S. 300.

Cónsono con el sentir de proteger al consumidor, la Asamblea Legislativa enmendó la Ley Núm. 10, Artículo 31, inciso 9, mediante la Ley Núm. 271. En lo pertinente, la Exposición de Motivos de la Ley Núm. 271 señala:

> La Ley Núm. 10 de 26 de abril de 1994 tuvo el propósito, entre otros, de reglamentar el negocio de Bienes Raíces **resultando en beneficio de los consumidores, así como también los Vendedores Corredores y Empresas de Bienes Raíces. Actualmente uno de los aspectos más importantes en una negociación de bienes raíces es la relación contractual que se establece con el cliente.** Estas negociaciones se formalizan comúnmente mediante '**contratos de corretaje' que deben de disponer de un término fijo de tiempo donde un corredor tiene los derechos para la venta de una propiedad.** Algunos corredores o vendedores de bienes raíces utilizan en sus contratos de corretaje las llamadas 'cláusulas automáticas de renovación' que tienen como fin prorrogar automáticamente, bajo los términos originales, el contrato de corretaje.
>
> Esta cláusula podría resultar engañosa, pues el cliente casi siempre **está consciente del término inicial del contrato que regularmente dura tres, cuatro o seis meses,** pero en raras ocasiones se percata de la extensión automática

del mismo, resultando en una extensión sustancial del contrato original. **Actualmente la Ley dispone que todo contrato que se acuerde y firme entre los clientes y los corredores, debe estar claro y bien explicado.** Debe existir la **seguridad y confianza entre las partes a la hora de realizar un contrato de corretaje,** aunque, lamentablemente la situación antes expresada es motivo de preocupación entre gran parte del sector dedicado a las bienes raíces así como también entre la ciudadanía interesada en estos importantes servicios.

Esta Asamblea Legislativa entiende meritorio el que no se permitan las cláusulas de renovación automáticas en **los contratos de corretaje entre los corredores de bienes raíces y sus clientes.** (Énfasis y subrayado suplido).

Como vemos, el lenguaje utilizado se dirige nuevamente a proteger al consumidor al momento de contratar con un corredor. Cabe señalar que la Exposición de Motivos da por hecho que los contratos de corretaje, en un sentido general, tendrán que tener fecha de vencimiento. Allí, el legislador no hizo distinción alguna entre tipos de contratos de corretaje. El sentir de la Asamblea Legislativa se enfoca en que los términos de los contratos queden claros a las partes. Aparentemente los términos "exclusivo o semiexclusivos", no se refieren necesariamente a tipos de contrato de corretaje, sino más bien a medios o formas de hacer la negociación con el corredor.

La enmienda claramente dice que las cláusulas de renovación automática no serán permitidas "en los contratos de corretaje". No lo limita y se refiere a todos, lo cual incluye los abiertos. Por lo tanto, una

renovación supone que los contratos de corretaje tienen que tener fecha de vencimiento. Concluir lo contrario sería legislar judicialmente para establecer que la enmienda de 1998 debe aplicar solamente a los contratos de corretaje exclusivos o semi-exclusivos. Una lectura integrada del texto del artículo, incluyendo la enmienda, aclara el sentir del legislador. Nada impide que tomemos en consideración, para efectos interpretativos, la exposición de motivos de una ley enmendadora. Con ello no desvirtuamos su contenido, sino que interpretamos la ley como un todo y le damos sentido lógico a las palabras del legislador.

Conforme a lo anterior, la Ley Núm. 10 no dispone expresamente que los contratos de corretaje de tipo abierto sean nulos por no contener fecha de vencimiento. No obstante, de un análisis del trasfondo de la intención legislativa para promulgar la Ley, la enmienda contenida en la Ley Núm. 271 y la Exposición de Motivos que de ella surge, se puede deducir que la Asamblea Legislativa quiso que todo contrato de corretaje tuviera una fecha de vencimiento o un término de duración. Tanto es así que al enmendar la Ley Núm. 10, la Asamblea Legislativa se enfocó en que ese término de duración, cuya existencia no cuestionaba, no debía ser renovado automáticamente. Al disponer que los contratos de corretaje no deban permitir las cláusulas de renovación automática, el legislador supuso que todo contrato de corretaje tiene una fecha de

vencimiento, independientemente del tipo de contrato de corretaje que sea, a saber, exclusivo, semiexclusivo o abierto.

El profesor de bienes raíces, Rafael A. Cintrón Perales, discutió en su obra las prácticas proscritas de la Ley Núm. 10 en los Artículos 31 y 32. Sobre este particular, indica:

> Los artículos 31 y 32 de la Ley Núm. 10, antes citada, establecen los actos y prácticas proscritas para la profesión de corredor, vendedor y empresas de bienes raíces. Es precisamente a estos actos o prácticas proscritas que debemos acudir para establecer las obligaciones del Corredor de Bienes Raíces para con sus clientes. Si analizamos los mismos, debemos concluir que todo corredor, vendedor o empresa de bienes raíces viene obligado a:
> [. . . . . . .]
> 8. Explicarle a su cliente todos los términos y condiciones, así como la **fecha de vencimiento** al momento de realizar un **contrato de corretaje exclusivo, semi-exclusivo o <u>abierto</u>**. (Énfasis y subrayado nuestro).
>
> R. Cintrón Perales, <u>El Contrato de Corretaje de Bienes Raíces y Opción de Compraventa de Propiedades Residenciales</u>, San Juan, Ediciones Situm, 2006, págs.17-18.

No tenemos duda, tal y como señalaron el Tribunal de Primera Instancia y el Tribunal de Apelaciones, que la intención legislativa al aprobar la Ley Núm. 10, Artículo 31, inciso 9, reafirmada en la Exposición de Motivos de la Ley Núm. 271, fue que todos los contratos de corretaje lleven fecha de vencimiento y que ésta sea explicada al cliente. En ese sentido, es razonable concluir que todo

contrato de corretaje que no contenga fecha de vencimiento es contrario a la ley y por ello, será nulo.

Un contrato de corretaje sin término de vencimiento es contrario a la Ley Núm. 10. Como se sabe las partes son libres para contratar lo que entienden necesario, siempre y cuando no sea contrario a la ley, la moral y el orden público. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. La violación de este principio podría producir la nulidad absoluta de lo pactado. Unisys v. Ramallo Bros, 128 D.P.R. 842, 851 (1991).

En fin, podemos colegir, mediante el análisis de las leyes especiales y los reglamentos anteriores sobre esta materia, que pese al lenguaje utilizado en el Artículo 31, inciso 9, siempre ha sido la intención legislativa que los corredores de bienes raíces le expliquen a sus clientes los términos del contrato, el alcance de la exclusividad o falta de la misma y la fecha de vencimiento. A base de lo anterior, es forzoso concluir que la intención legislativa de la Ley Núm. 10 fue que todos los contratos de corretaje tuvieran fecha de vencimiento. Por lo tanto, son contrarios a la ley los contratos que no la contengan. Eso los hace nulos.

### III

Nos resta por resolver si el derecho de un corredor de bienes raíces a recibir la comisión se desvanece cuando la compraventa se perfecciona luego de vencido el contrato de corretaje. No existe una norma clara sobre

esta interrogante. La controversia de derecho es crucial en este caso, ya que si se resuelve que el contrato tenía un término de vigencia de seis (6) meses, ya habría vencido cuando se perfeccionó la venta. Tomando en consideración que la Ley Núm. 10 prohíbe específicamente la renovación automática de los términos de los contratos de corretaje, restaría decidir entonces, qué derechos, si alguno, le asisten al corredor.

Como cuestión preliminar debemos discutir cuándo un corredor de bienes raíces tiene derecho a una comisión en un contrato de corretaje. La norma aceptada por este Tribunal y la mayoría de los estados sobre el derecho a recibir comisión es la doctrina de "ready, willing and able". Véase, Taylor v. Weingart, 693 P 2d. 1231, 1233 (Mont. 1984). Esta doctrina es utilizada cuando no queda claro en el contrato en cuáles circunstancias el corredor tiene derecho a recibir la comisión.

Este Tribunal acogió la doctrina de "ready, willing and able" en el caso de Torres v. Arbona Jr., 72 D.P.R. 769 (1951).[1] En aquella ocasión, apuntamos que en casos en los que existe un conflicto en el perfeccionamiento de la

---

[1] Esta doctrina se adoptó en Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, New York, Nevada, Texas, entre otros estados. D. Barlow Burke, Jr., op cit., § 5.02, pág. 5.2-5.9. Los estados que no acogen esa doctrina recurren a la norma de "no closing, no commission" que nació en el caso de Ellswoth Dobbs, Inc. v. Johnson, 50 N.J. 528, 236 A. 2d 843 (1967). Estados como Massachuttes, Kansas, Idaho, Nebraska, Oregón y Vermont adoptaron esta regla. D. Barlow Burke, Jr., op cit., §6.01-6.04, pág. 6.1-6.68. Véanse, Dworak v. Michals, 211 Neb. 716, 320 N.W. 2d 485 (1982); Tristam´s Landing v. Wait, 367 Mass. 622, 327 N.E. 2d 727 (1975); Winkelman v. Allen, 214 Kan. 22, 519 P. 2d 1377 (1974); → Setser v. Commonwealth, Inc., 256 Or. 11, 470 P 2d 142 (1970); Staab V. Messier, 128 Vt. 380, 264 A.2d 790 (1970).

compraventa, el corredor que procuró un comprador dispuesto, deseoso y en condiciones económicas de comprar ("ready, willing and able"), bajo los términos establecidos por el vendedor, tiene derecho a recibir la comisión pactada. Id., pág. 778. Asimismo indicamos que cuando se pacta que la comisión queda supeditada a la consumación del contrato, el corredor tendrá derecho a la comisión si la compraventa no se consumó debido a fraude, culpa o mala fe del vendedor. Id.

En Colegio Internacional Sek Puerto Rico, Inc. v. Escribá, supra, volvimos a hacer referencia a esa doctrina. En ese caso, reiteramos que el corredor tiene derecho a la comisión desde el momento en que se perfecciona el contrato. Igualmente, tiene derecho a la comisión si, por causas imputables a los contratantes, el negocio no llega a consumarse. Tal será el caso de fraude, culpa o mala fe del vendedor para que el contrato de venta no se realice. Id., pág. 657. Con ello se protege al corredor ante el caso de que al vendedor ya no le interese o sencillamente se arrepienta de vender.

Como norma general, entonces, cuando un contrato no disponga cómo y por qué se otorgará compensación, el corredor tendrá derecho a recibir la comisión si procura un prospecto listo, dispuesto y capaz de comprar ("ready, willing and able"). Ese prospecto debe querer entrar voluntariamente en un contrato vinculante de compraventa sobre la propiedad disponible y realizar una oferta.

Además, no necesita mayor convencimiento para comprar y debe permanecer tiempo suficiente en ese estado mental para que se realice una negociación dirigida a que se acepte su oferta. Una oferta por escrito es prueba *prima facie* de ese estado mental. D. Barlow Burke. Jr., op cit., § 5.02 [A], pág. 5.27.

Ahora bien, en ocasiones, a pesar de haberse perfeccionado la transacción de bienes raíces, surge otro tipo de controversia entre el cliente y el corredor. Tal es el caso, como en el presente, en que el vendedor entiende que el tercero no llegó a perfeccionar el negocio a través de los esfuerzos del corredor. En ese tipo de situaciones, la doctrina mayoritaria reconocida para establecer si un corredor es acreedor de la comisión, es la doctrina de causa eficiente que hizo que se perfeccionara la transacción ("efficient procuring cause"). Esta doctrina ha sido acogida por la mayoría de las jurisdicciones estadounidenses y va de la mano del comprador listo, deseoso y en condiciones económicas de comprar ("ready, willing and able"). Véase, Luther Zeigler, Brokers and Their Commissions, 14 Real Est. L. J. 122, 123 (1985). En el caso de los contratos de corretaje abierto, especialmente en casos en los que existe más de un corredor tratando de vender el bien, esta norma es altamente determinante y generalmente utilizada por los tribunales estatales.

Puerto Rico tiene un sistema legal mixto. J. Trías Monge, The Structure of the American Legal System – Its Sources, Forms and Theory of Law, 51 Rev. Jur. U.P.R. 11, 16 (1982). Este híbrido es el resultado exitoso de la interacción centenaria de principios legales, casuística, leyes y códigos provenientes tanto del derecho civil español como del derecho consuetudinario (*common law*) estadounidense. Para una discusión detallada e ilustrativa al respecto, véase, Matos Rivera v. Flav-O-Rich, 876 F. Supp 573 (D.P.R. 1995). Por eso "no hemos dudado en ocasiones anteriores al adoptar doctrinas y normas de interpretación del *common law* cuando las hemos considerado acertadas y enriquecedoras de nuestro Derecho". Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 169 (1994). Lo crucial es que lo hagamos con la reflexión y corrección debida, para que no desnaturalicemos los principios de derecho civilistas y del derecho consuetudinario que constituyen parte fundamental de nuestro ordenamiento legal autóctono y que en conjunto, en sus ámbitos respectivos, conforman el derecho puertorriqueño contemporáneo.

Cónsono con esta visión, adoptamos hoy la norma estadounidense de la causa eficiente que procuró que se perfeccionara la transacción ("procuring cause"). Esa norma es cónsona con el estado de nuestro derecho puertorriqueño y con nuestra realidad económica.

La doctrina de la causa eficiente que procuró que se perfeccionara la transacción ("procuring cause") no se enfoca en las cualificaciones de la persona interesada que consiguió el corredor, sino en la cadena de eventos que de otra forma llevarían al corredor a recibir la comisión. Por ejemplo, lo esencial será el perfeccionamiento del contrato de compraventa, el cierre hipotecario o cualquier otra condición que se estableciera en el contrato para que el corredor recibiera la comisión. Id., pág. 5.51-5.52. Véase, Dale Denton Real Estate, Inc. v. Fitzgerarld, 635 A. 2d 925, 928 (D.C. App. 1993). En ese sentido, se entiende que un corredor procuró una venta si ésta se perfeccionó a través de sus esfuerzos, mediante la utilización de promociones, mercadeo, rótulos, anuncios y negociaciones, entre otras.

El término procurar, en esta doctrina, es el inicio de una serie de eventos consecutivos que llevan a la perfección de la transacción de bienes raíces o al cumplimiento de su encomienda como intermediario. Mientras más corta sea la cadena de eventos que llevaron al perfeccionamiento del contrato, más favorable será para el corredor recibir la compensación pactada. Además, si hubo una ruptura en la cadena de eventos pertinentes, se debe concluir que la gestión del corredor no fue la causa que procuró la negociación. D. Barlow Burke, Jr., op cit., § 5.04, pág. 5.53. Véase, B-H, Inc.

v. Industrial America, Inc., 253 A. 2d 209, 214 (Del.
Super. 1969).

Un corredor de bienes raíces no tiene derecho a
recobrar comisión cuando sus esfuerzos solamente
produjeron un evento en la cadena de acciones que
contribuyó a la venta de la propiedad. D. Barlow Burke,
Jr., op cit., § 5.04, pág. 5.56. Véase, ERA Joseph Green
Real Estate, Inc. v. Daubert, 588 N.Y.S. 2d 922 (N.Y.
App. Div. 1992). Por ejemplo, en Arkansas se ha
reconocido que un corredor no tiene derecho a recobrar la
comisión cuando solamente realizó un evento en la cadena
de acción. El corredor debe ser la causa próxima de la
venta y no un mero eslabón incidental. Además, la venta
debe ser el resultado del curso continuo de los
eventos. Hatchett v. Story, 221 Ark. 120, 252 S.W.2d 78
(1952). No es suficiente que el corredor sea el primero
en poner a las partes en contacto. Si las partes
abandonan las negociaciones y otro corredor eventualmente
vende la propiedad, será el último el que adquiere el
derecho a recibir la comisión. Mix v. Broyles, 567 S. W.
2d 696 (Mo. Ct. App. 1978). No obstante, el corredor
tiene derecho a recibir la comisión cuando es excluido de
la venta final, si demuestra su participación activa en
la cadena de eventos y no es un suceso aislado. Véase,
Barrett v. Land Mart of America, 3 Ark. App. 70, 621
S.W.2d 889 (1981); Storey v. Johnson, 270 Ark. 392, 605
S.W.2d 480 (Ark. App. 1980).

Por regla general y conforme a lo anteriormente expresado, en los contratos de corretaje de tipo abierto, "el primer corredor que produzca un cliente listo, dispuesto y capaz económicamente y que concrete la transacción con el dueño de la propiedad es el que tendrá derecho al pago de la comisión". Cintrón Perales, op cit., págs. 88-89. Un comprador listo, dispuesto y capaz, es aquél que celebre la transacción bajo los términos del vendedor. D. Barlow Burke. Jr., Law of Real State Brokers, Third Edition, Aspen Publishers, 2009, § 2.02, pág. 2.25.

En los contratos de tipo abierto, el hecho de que uno de los corredores, que tiene a su cargo la propiedad, introduzca un prospecto al cliente, no impide que otro corredor sea el que procuró ("procuring cause"), o sea quien produjo la compraventa, y por ende, quien tiene derecho a la comisión pactada. D. Barlow Burke. Jr., op cit., pág. 2.25-2.26. Véase, además, Staubus v. Reid, 652 S.W. 2d. 293 (Mo. App. 1983). Es decir, la comisión la recibirá el corredor que persuadió e indujo al tercero a convenir el arreglo financiero. Además, en los contratos de corretaje de tipo abierto "el dueño mantiene el derecho de realizar gestiones por sí mismo para vender la propiedad". Cintrón Perales, op cit., págs. 88-89.

Como se puede apreciar, la doctrina de la causa que produjo la transacción ("procuring cause") depende de los hechos de cada caso. Algunas jurisdicciones insisten en

que es muy oneroso que el corredor pueda encontrar una persona lista, dispuesta y capaz durante el término del contrato. Por esa razón, utilizan la doctrina en casos en los que los contratos de corretaje ya expiraron, pero todavía quedaban negociaciones pendientes con algunos prospectos en un tiempo relativamente cercano a la expiración del contrato. D. Barlow Burke, Jr., op cit., § 5.04, pág. 5.51, 5.70. Véase, Paine-Wetzel Assocs., Inc. v. Dockside Dev. Corp., 529 N.E. 2d 588, 589 (Ill. App. 1988).

Evidentemente, la expiración del plazo pactado conlleva la extinción del contrato de corretaje. El término de una obligación es de vital importancia, ya que define a las partes la cantidad de tiempo en la que quedan obligadas. En los contratos de corretaje el corredor se compromete a la realización de los esfuerzos y gestiones para conseguir un comprador que esté dispuesto y en condiciones de llevar a cabo la compraventa en un período de tiempo específico. Ello es la razón que obliga al vendedor a cumplir con su promesa de pago, o sea, la comisión.

Ahora bien, debemos determinar qué ocurre si se produce una oferta del comprador con el prospecto que inicialmente hizo gestiones, luego de la expiración del contrato de corretaje. El corredor ya no tendría derecho conforme al contrato. Sin embargo, el corredor tiene derecho a reclamar una compensación debido a que el

vendedor recibió un beneficio de sus esfuerzos. Esa compensación no es por incumplimiento de contrato sino en virtud de la doctrina de la causa que produjo la compraventa ("procuring cause") y será una acción de *quantum meruit*. Véanse, Amend v. 485 Properties, 280 Ga. 327, 627 S.E. 2d 565 (2006); Allen v. T.A. Communications, 181 Ga. App. 726, 727 (353 S.E. 2d 569) (1987).

Generalmente este tipo de conflicto se resuelve en la práctica con la incorporación de una cláusula de extensión en los contratos de corretaje. De hecho, el Profesor Cintrón Perales llama la atención a que el corredor de bienes raíces debe tener presente que conforme a la Ley Núm. 10 las cláusulas de renovación automática están vedadas, por lo que algunos corredores establecen, como medida de precaución, unas **cláusulas de extensión** que les permiten cobrar al corredor aún pasado el término del contrato. Ellas son distintas a las cláusulas de renovación automática. Sobre este particular, Cintrón Perales indica:

> En la práctica de la profesión comúnmente se utiliza una cláusula donde el corredor informa al cliente sobre su obligación de pagar la comisión si luego de vencido el contrato **y dentro de cierto término**, este le vende a un comprador que llegó a la transacción, por conducto y los esfuerzos del corredor. Esta cláusula es conocida como una **cláusula de extensión** la cual sirve para proteger al corredor del vendedor que espera hasta que finalice el término del contrato de corretaje para luego realizar la transacción con algún prospecto comprador que fue llevado a la

propiedad por el corredor. (Énfasis en el original).

R. Cintrón Perales, op cit., págs. 60-61.

Expone, además, que usualmente en las cláusulas de extensión en contratos de transacciones residenciales, como uso y costumbre, el término de esos contratos es de seis meses. Id. pág. 60. Recomienda que, para que tales cláusulas sean efectivas, el corredor notifique por escrito las personas a las que ha mostrado la propiedad, así como la hora y fecha de la gestión. Id., pág. 61. Finalmente, expone que tales cláusulas no son una renovación automática del contrato, por lo que no están vedadas por la Ley Núm. 10.

Como vemos, el tratadista nos explica que existen unas cláusulas de extensión diseñadas para proteger la gestión del corredor. Con ellas se persigue garantizar que, en caso de que el término del contrato esté por vencer y las partes se encuentren en espera de un tercero para perfeccionar la compraventa, el corredor pueda cobrar su comisión si se completa el negocio jurídico con posterioridad. Como regla general, una vez vencido el término del contrato, la obligación termina y el contrato se extingue. Es solamente mediante pacto en contrario y por un término definido que el corredor puede extender los efectos del contrato de corretaje. No podría ser de otra forma, porque lo contrario sería reconocer al corredor un gravamen indefinido sobre la venta del bien

con una persona con la cuál interactuó el corredor en un momento dado. Ello sería irrazonable.

No incluir la cláusula de extensión, podría crear una controversia con el cliente sobre el pago de la comisión cuando la compraventa se genera con posterioridad al vencimiento del contrato de corretaje. R. Cintrón Perales, op cit., pág. 61. En el contrato ante nuestra consideración no existió cláusula de extensión alguna. No obstante, el corredor debía conocer el alcance y propósito de este tipo de cláusula, ya que en dos contratos con otros clientes la incorporó. Estos contratos fueron sometidos junto a la solicitud de la sentencia sumaria de los recurridos.

Tras todo este análisis, concluimos que todos los contratos de corretaje deben tener fecha de vigencia o de vencimiento. Reiteramos que como norma general, el corredor adquiere el derecho a recibir comisión una vez se celebre un contrato entre su cliente y un tercero adquiriente durante la vigencia del contrato de corretaje de bienes raíces. Cuando el contrato de corretaje de bienes raíces no tiene una cláusula de extensión, expira y al poco tiempo se celebra la compraventa, el corredor tiene derecho a recibir la compensación si prueba que él consiguió al comprador listo, dispuesto y capaz. El corredor debe probar que fue él quien llevó las partes a las negociaciones y quien medió para el resultado logrado. Por otro lado, el corredor también tiene derecho

a una compensación si prueba que no consiguió el perfeccionamiento de la compraventa por mala fe, fraude o culpa del vendedor. En ausencia de alguna de estas circunstancias el corredor no recibirá compensación alguna.

En este caso, existe controversia sobre si el contrato entre las partes tenía fecha de vencimiento. Igualmente, existe controversia de hechos acerca de si el señor Rodríguez Vélez fue el promotor de la compraventa que se generó y sobre el porcentaje de compensación que las partes estipularon. La parte peticionaria insistió en que la comisión pactada fue de 5% y, por el contrario, la parte recurrida estimó que acordaron un 4% del precio de venta. Es sabido que procede dictar sentencia sumaria sólo en los casos en que no existe controversia de hechos relevantes para la resolución del caso. Ramos Pérez v. Univisión Puerto Rico, Op. de 3 de febrero de 2010, 2010 T.S.P.R. 15, 2010 J.T.S. 24, 178 D.P.R. ___ (2010). Ante los múltiples hechos esenciales en controversia en este caso, no se puede emitir una sentencia sumaria.

                                    IV

Por todo lo antes expuesto, se revoca la sentencia del Tribunal de Apelaciones, Región Judicial de San Juan. Ante la presencia de controversias que involucran cuestiones de credibilidad no adjudicadas, devolvemos el caso al Tribunal de Primera Instancia para que evalúe si

el contrato de servicios de bienes raíces tuvo un término de vencimiento. De no tenerlo, el tribunal debe concluir que ese contrato fue nulo.

Ahora bien, si el tribunal concluye que el contrato tuvo un término de seis meses, debe evaluar si el corredor abandonó su encomienda o si fue él quien llevó al vendedor y al tercero a contratar. Para ello, el tribunal debe evaluar la cadena de eventos que condujo a la negociación. Además, de no haber sido el corredor quien procuró la venta, el tribunal deberá evaluar si ello no ocurrió por fraude o mala fe del vendedor o principal. Si hubo mala fe o fraude, el corredor tendrá derecho a una compensación razonable, correspondiente a sus esfuerzos. Finalmente, si concluye que el corredor tiene derecho contractual a una compensación, el foro primario deberá estimar cuál fue el porcentaje de compensación acordado entre las partes, ya que eso también está en controversia.

Se dictará sentencia de conformidad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Giovani Rodríguez Vélez y su esposa Gidalsy Rivera Hernández y la Sociedad Legal de Gananciales compuesta por ambos<br><br>        Peticionarios<br><br>                v.<br><br>Bahía Park, S.E.; Carlos García Muñiz y su esposa Fulana de Tal y la Sociedad Legal de Gananciales compuesta por ambos, personalmente y como socios de Bahía Park, S.E., los demás socios actualmente desconocidos de Bahía Park, S.E.; Denominados Provisionalmente X, Y y Z<br><br>        Recurridos | CC-2007-518 |

SENTENCIA

En San Juan, Puerto Rico, a 14 de diciembre de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se revoca la sentencia del Tribunal de Apelaciones, Región Judicial de San Juan. Se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos de manera consistente con lo dispuesto en nuestra Opinión.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurre y disiente con opinión escrita a la que se une el Juez Presidente señor Hernández Denton. La Jueza Asociada señora Fiol Matta concurre sin opinión escrita.

Aida I. oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Giovanni Rodríguez Vélez y su esposa Gidalsy Rivera Hernández y la Sociedad Legal de Gananciales compuesta por ambos<br><br>    Peticionarios<br><br>        v.<br><br>Bahía Park, S.E.; Carlos García Muñiz y su esposa Fulana de Tal y la Sociedad Legal de Gananciales compuesta por ambos, personalmente y como socios de Bahía Park, S.E.; Los Demás Socios Actualmente Desconocidos de Bahía Park, S.E., Denominados Provisionalmente como X,Y y Z<br><br>    Recurridos | CC-2007-518 |

Opinión concurrente y disidente emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se une el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico, a 14 de diciembre de 2010

La Opinión mayoritaria en este caso concluye, luego de una forzada interpretación del artículo 10 de la Ley para Reglamentar el Negocio de Bienes Raíces, Ley Núm. 10 de 26 de abril de 1994, 20 L.P.R.A. secs. 3025 *et seq.* (Ley 10), que todo contrato de corretaje tiene que tener una fecha de vencimiento para su eficacia. En otras palabras, esta Opinión establece que tal requisito es de carácter constitutivo no tan sólo para los contratos de corretaje exclusivo y semi exclusivo como exige la ley, sino que, mediante *fiat* judicial, ahora es exigible a los contratos abiertos.

CC-2007-518

No comparto el razonamiento que utiliza el Tribunal para llegar a su conclusión por varias razones. Primero, considero que la ley que se interpreta no adolece de falta de claridad y que, tanto su texto como su historial patentizan que la intención del legislador fue regular sólo los contratos de corretaje exclusivo y semi exclusivo dejando fuera, del requisito aquí impuesto, a los contratos de corretaje abierto. Segundo, la interpretación del Tribunal es ajena, y como tal contraria a, la naturaleza misma del contrato de corretaje abierto. Es por ello que disiento del curso trazado por la mayoría del Tribunal.

Por otro lado, es menester señalar que, al igual que el Tribunal, considero que existen controversias sobre hechos esenciales que impiden que este caso sea resuelto por la vía sumaria, por lo cual concurro con esta determinación.

I.

En nuestra jurisdicción la doctrina reconoce varios tipos de contratos de corretaje de bienes raíces. Los principales son: 1) contrato de corretaje exclusivo; 2) contrato de corretaje semi exclusivo; 3) contrato de corretaje abierto. R. A. Cintrón Perales, *El Contrato de Corretaje de Bienes Raíces y de Opción de Compraventa de Propiedades Residenciales*, Ed. Situm, San Juan, Puerto Rico, 2006, pág. 85. La doctrina también reconoce el contrato de corretaje con acuerdo neto y el contrato de sub-corretaje o *co-broking.* El primero se refiere a una modificación en la forma de remuneración del corredor y el segundo, a un acuerdo de cooperación entre dos o más corredores

para llevar a cabo determinada transacción de bienes raíces. *Id.*, pág. 91.

En los contratos de corretaje exclusivo y semi exclusivo, "el dueño de una propiedad le concede al corredor la autorización única y exclusiva para actuar como intermediario en una [sic] representación de éste para ofrecer, promocionar y negociar determinada transacción de bienes raíces". *Id., págs.* 86-87. Ambos contratos se diferencian en que, en los semi exclusivos, el propietario no renuncia al derecho de "realizar gestiones para perfeccionar la transacción de bienes raíces por sí mismo". *Id.* La exclusividad no se presume, por lo que, para que tal renuncia sea válida y el contrato goce de plena exclusividad, así debe pactarse expresamente en el contrato de corretaje. *Id.* pág. 87; D. Barlow Burke, Jr., *Law of the Real State Brokers*, 3ra ed., Aspen, 2009, Sección 2.02 (B), págs. 2-30 (Discute jurisprudencia estadounidense de los tribunales estatales a esos efectos).

En cambio, en los contratos de corretaje de tipo abierto, "el dueño de la propiedad se reserva la facultad de contratar el número de corredores de bienes raíces que desee". *Véase*, R. A. Cintrón Perales, *op. cit.*, págs. 88-89. Es decir, durante la vigencia del contrato abierto, el oferente no está impedido de dirigirse a otros corredores con el propósito de asignarle la misma encomienda que le fuera asignada anteriormente a otro corredor. De ahí que "el derecho a exigir el pago de la comisión será de aquel corredor que haya sido quien procuró que se perfeccionara la transacción de bienes raíces (*procuring cause*)". *Id.*, pág.

89. Este tipo de contrato es de carácter informal y se utiliza comúnmente en transacciones que involucran propiedad comercial, o incluso residencial, cuando el propietario necesita disponer de éstas con premura, pues al no estar atado a un solo corredor se multiplican las posibilidades de conseguir un comprador. *Véase*, D. Barlow Burke, Jr., *op. cit.*, Sección 2.02 (A), págs. 2-24.

Por otra parte, el negocio de corretaje está regulado de forma específica en nuestro ordenamiento por la Ley 10. Con su adopción, se agruparon en una sola ley todas las disposiciones legales pertinentes al negocio de bienes raíces existentes hasta ese entonces, y se dispuso un cuerpo reglamentario nuevo y más estricto con el fin de beneficiar a los consumidores y a los vendedores, corredores o empresas de bienes raíces. *Véanse*, Exposición de Motivos de la Ley para Reglamentar el Negocio de Bienes Raíces, Leyes de Puerto Rico, 1994, págs. 43-44; *Vélez v. Izquierdo*, 162 D.P.R. 88, 95 (2004).

La ley se refiere a distintos tipos de contratos de corretaje, pero no incluye los contratos de corretaje de tipo abierto. De esta falta de reglamentación, el Tribunal concluye que la ley es confusa, embarcándose en un tortuoso viaje de interpretación judicial para "aclarar" la "confusión". Sostengo que la ausencia de referencia en la ley del contrato de tipo abierto, es indicativo de que la Legislatura no quiso imponerle a estos tipos de contratos informales los mismos requisitos que a los contratos de naturaleza exclusiva y semi exclusiva.

Así, entre los actos o prácticas específicas proscritas por la Ley para Reglamentar el Negocio de Bienes Raíces, la ley menciona que:

Se prohíbe a toda persona sujeta a las disposiciones de [esta ley] a incurrir, o inducir a otra persona a incurrir, en cualquiera de los actos o prácticas que se enumeran a continuación:

. . . .

(9)   Realizar con cualquier parte un contrato de **corretaje exclusivo  o semi exclusivo**, sin explicarle los términos y condiciones del mismo, y su fecha de vencimiento; disponiéndose, que no serán permitidas las cláusulas de renovación automáticas en los contratos  de corretaje.   20 L.P.R.A. 2054(a)(9).   (Énfasis suplido).

Nótese, que la ley es clara al exigir que los contratos de corretaje exclusivo y semi exclusivo contengan "fecha de vencimiento."  Lo cierto es que los contratos de corretaje de tipo abierto no eran desconocidos en la doctrina a la fecha en que se aprobó la Ley Núm. 10, por lo que su omisión en ésta fue un acto consciente y no un mero olvido o algo que apunte a confusión.

Ello no obstante, la mayoría de esta Curia considera que el referido texto es confuso, razón por la cual estima necesario interpretar el significado del texto legislativo. Considero que es innecesario embarcarse en una travesía interpretativa en búsqueda de la intención legislativa. Veamos en mayor detalle.

II

A

La Opinión del Tribunal parte de una apreciación equivocada acerca del contenido de la Ley 10 al presumir que ésta trata de igual forma a todos los tipos de contratos de corretaje y que no crea distinción alguna entre éstos. Tal presunción es incorrecta, ya que en determinadas instancias, la ley alude específicamente a tipos de contratos en particular con el propósito de sumar exigencias y garantizar un mayor grado de certidumbre para el consumidor de servicios. Tal es el caso de los contratos exclusivos, semi exclusivos y con acuerdo neto. En la medida que la ley reconoce la existencia de distintos tipos de contratos de corretaje, se patentiza que la ausencia de uno de estos tipos de contrato en la ley fue determinación consciente.

Por ejemplo, y como ya vimos, al enumerar los actos o prácticas proscritas dentro de la profesión de corredor o vendedor de bienes raíces, el legislador prohibió claramente en el artículo que interpretamos, "realizar con cualquier parte un contrato de **corretaje exclusivo o semi exclusivo**, sin explicarle los términos y condiciones del mismo, y su fecha de vencimiento. . .". (Énfasis suplido) 20 L.P.R.A. sec. 3054 (a)(9). Así también, el artículo 31(16), distinguió los contratos de corretaje con acuerdo neto cuando proscribió: "Previo al otorgamiento de un **contrato de corretaje o listado neto**, no orientar adecuadamente al cliente sobre el alcance de la transacción y la conveniencia de utilizar los servicios de un tasador

profesional". (Énfasis suplido). 20 L.P.R.A. sec. 3054 (a)(16). Como bien se puede apreciar, no todos los tipos de contrato reciben el mismo trato. Al utilizar la terminología típica de la profesión de corretaje, resulta evidente que el legislador pretendió dar tratamiento disímil a los distintos tipos de contratos de corretaje.

Como ya adelantamos, en los contratos exclusivos y semi exclusivos, el dueño de la propiedad se obliga a no firmar otros contratos de corretaje con otros corredores. R. A. Cintrón Perales, *op. cit.*, pág. 86. Asimismo, mediante pacto expreso, el propietario tiene la opción de renunciar al derecho de realizar gestiones a fines de llevar a cabo transacciones de bienes raíces por sí mismo. En este tipo de contrato el propietario limita las actividades que puede llevar a cabo para disponer de su propiedad. *Id.* Es por ello que se hace necesario que se le incluyan limitaciones, como la fecha de vencimiento, habida cuenta que con este tipo de contrato el propietario está impedido de disponer de su propiedad por su cuenta. El propietario no puede realizar gestiones por sí mismo a los fines de concretar determinada transacción de bienes raíces. Estas limitaciones a lo que es su derecho propietario, justifican la exigencia de fecha de vencimiento en este tipo de contrato. Así lo entendió el legislador en su momento y ello surge claramente del texto de la Ley Núm. 10 y, como veremos, de las leyes y reglamentos que le precedieron.

Por el contrario, los contratos de corretaje abierto otorgan mayor flexibilidad al dueño que pretende disponer de su propiedad, permitiéndole contratar con varios corredores de bienes raíces de forma simultánea. Es decir, la naturaleza flexible de los contratos de corretaje abierto permite que éstos no requieran un plazo de vigencia ya que "el dueño de la propiedad se reserva la facultad de contratar el número de corredores de bienes raíces que desee". R. A. Cintrón Perales, *op. cit.*, págs. 88-89. Esto permite que en caso de que el propietario no esté conforme con las ejecutorias del corredor o desee agilizar la transacción, por ejemplo, explore otras alternativas a fines de concretar sus objetivos.

Es la naturaleza misma de estos dos tipos de contrato de corretaje lo que justifica y explica su trato disímil por el legislador, pero que la mayoría ignora.

B

A pesar de que una lectura integral de la Ley Núm. 10, deja establecido que el legislador distinguió entre los tipos de contratos de corretaje, el Tribunal se embarca en una infructuosa expedición interpretativa a través de varias leyes y reglamentos derogados por la Ley Núm. 10, para encontrar allí soporte para su teoría. Véanse, *Ley para reglamentar el ejercicio de la profesión de Corredor de Bienes Raíces,* Ley Núm. 139 de 14 de junio de 1980, Leyes de Puerto Rico, 1980, pág. 544; *Reglamento sobre Competencia Justa Núm. V* (Regulando en Puerto Rico el negocio de bienes raíces en Puerto Rico) Núm. 1639, Oficina

de Asuntos Monopolísticos, 8 de febrero de 1973; *Ley para reglamentar las transacciones realizadas en la Isla por compañías dedicadas a la venta de bienes raíces localizados fuera de Puerto Rico,* Ley Núm. 145 de 18 de junio de 1980, Leyes de Puerto Rico, 1980, pág. 588; y *Reglamento sobre Competencia Justa Núm. IV* (Regulando en Puerto Rico la venta de terrenos localizados fuera de Puerto Rico) Núm. 1375, Oficina de Asuntos Monopolísticos, 25 de septiembre de 1970.

Como parte de esta búsqueda, la mayoría comienza citando el artículo 8 (l)(3) de la derogada Ley Núm. 145, el cual prohibía "ofrecer vender o vender solares sin especificar en el **contrato de venta** . . . el término de duración de dicho contrato, incluyendo específicamente la fecha de vencimiento". (Énfasis suplido). Art. 8 (l)(3) de la Ley 145 de 18 de junio de 1980. Tal como la Opinión del Tribunal reconoce, el vencimiento al que hace referencia este inciso no versa sobre la relación de corretaje entre el propietario y el agente corredor, sino sobre el contenido del contrato de compraventa de una propiedad. Por tal razón, su sola mención resulta impertinente a la luz de la controversia que nos ocupa. Más aún, no concibo cómo este Foro puede llegar a concluir que el artículo 31 (9) de la Ley Núm. 10, "parece ser el producto" del artículo 8 (l) (3) de la Ley Núm. 145 debido a que este último utiliza la palabra "vencimiento".

Además, lo cierto es que esta cláusula se incluyó, casi en su totalidad, en el texto de la Ley Núm. 10, pero

para referirse al contenido del contrato de compraventa y no a la relación de corretaje entre el agente y el propietario. Dispone la Ley Núm. 10, en su artículo 32 (a)(11)(B):

(a) Actos o prácticas proscritas a vendedores, corredores y empresas en la venta de bienes inmuebles localizados **fuera** de Puerto Rico:

. . . .

(11) Ofrecer vender o vender solares sin especificar en el **contrato de venta**:

(A) Todo lo relacionado…

(B) Quien acarreara la deuda contributiva durante el período de tiempo en que se estén pagando los plazos adecuados para la compra de dicho solar y si ésta recayer[e] sobre el comprador, la porción del total de la mensualidad adecuada que se dedicara a este concepto, un desglose en forma detallada de los conceptos a los cuales será aplicada la mensualidad y **el término de duración de dicho contrato, incluyendo específicamente, la fecha de vencimiento.** 20 L.P.R.A. Sec. 3055 (a)(11)(B). (Énfasis suplido y corchete en el original).

Con lo cual, no logro comprender cómo la mayoría llega a su conclusión.

Por otra parte, la Opinión mayoritaria cita el texto del inciso 23 del artículo V del derogado Reglamento sobre Competencia Justa Núm. V. El referido reglamento fue aprobado en virtud de la *Ley para prohibir las prácticas monopolísticas y proteger la justa y libre competencia en los negocios y el comercio*, Ley Núm. 77 de 25 de junio de 1964, con el propósito de "regular las transacciones que [involucraban] bienes raíces localizados en el Estado Libre Asociado de Puerto Rico . . .". Art. II del Reglamento sobre Competencia Justa Núm. V. A esos efectos, el

reglamento prohibía "concertar con cualquier cliente un contrato autorizando que el corredor o vendedor [actuara] como el agente **exclusivo** en la venta de dicha propiedad **sin antes informar al cliente sobre el alcance de dicha exclusividad**". (Énfasis suplido).  Art. V (a)(23) del Reglamento sobre Competencia Justa Núm. V.

Como sabemos, uno de los objetivos de la Ley 10 fue agrupar la legislación anterior que regulaba el negocio de bienes raíces.  A tales fines, el legislador trasladó casi intactas varias disposiciones contenidas en leyes derogadas.  De hecho, en el anteproyecto de la Ley 10, se utilizó un lenguaje muy parecido al del mencionado artículo V del Reglamento Núm. V, al disponer: "[c]oncertar con cualquier cliente un contrato de corretaje **exclusivo** o **semi exclusivo**, sin explicarle sobre los alcances de esta **exclusividad** o **semi exclusividad** o no indicar en dicho contrato la fecha de expiración del mismo."  (Énfasis suplido).  P. del S. 300 de 30 de abril de 1993, 1ra Sesión Ordinaria, 12ª Asamblea Legislativa, pág. 25.

Es pertinente señalar que el referido anteproyecto sólo fue modificado en su versión final para "simplificar las prácticas prohibidas por [la Ley Núm. 10]", más no por motivos adicionales que pudieran ahora trastocar la interpretación del texto utilizado en el anteproyecto.  P. del S. 300 de 30 de abril de 1993, 2da Sesión Ordinaria, 12ª Asamblea Legislativa, Informe Conjunto presentado por la Comisión de Gobierno, de Vivienda y de Asuntos del Consumidor, 18 de octubre de 1993, pág. 8.

El artículo 31 (9) de la Ley 10 tiene su génesis en el texto del Reglamento Núm. V.  Su incorporación a la Ley 10 manifiesta que el legislador, históricamente, ha procurado estatuir mayores limitaciones para los contratos con acuerdos de exclusividad, omitiendo extenderlas a los contratos abiertos.  Asimismo, ambas disposiciones demuestran un interés del legislador en que el consumidor conozca el alcance **de la exclusividad**.  No veo, entonces, de dónde surge la "confusión" que invoca la Opinión del Tribunal.

La ponencia hace referencia a una de varias enmiendas realizadas a la Ley Núm. 10[2].  En específico, discute la Exposición de Motivos de la Ley Núm. 271 de 6 de octubre de 1998 – que prohibió las cláusulas de renovación automática en los contratos de corretaje – para concluir que todos los contratos de corretaje, aun los de tipo abierto, tienen que tener fecha de vencimiento.  En lo pertinente, la Exposición de Motivos dispone:

> La Ley Núm. 10 de 26 de abril de 1994 tuvo el propósito, entre otros, de reglamentar el negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresas de Bienes Raíces en Puerto Rico.  Ésta logró agrupar todas las disposiciones legales existentes en el campo de las Bienes Raíces, resultando en beneficio de los consumidores, así como también de los Vendedores, Corredores y Empresas de Bienes Raíces. Actualmente uno de los aspectos más importantes en una negociación de bienes raíces es la relación contractual que se establece con el cliente.  Estas negociaciones se formalizan **comúnmente** mediante "contratos de corretaje" que

---

[2] Cabe señalar que el artículo 31 de la Ley Núm. 10 ha sido enmendado luego de su aprobación en tres ocasiones: 1998, 1999 y 2006.  El texto de la primera oración del artículo 31 (9) no fue alterado en ninguna de esas tres instancias.

> deben disponer de un término fijo de tiempo donde un corredor tiene los derechos para la venta de una propiedad.

Exposición de Motivos de la Ley Núm. 271, Leyes de Puerto Rico, 1998, pág. 1285.  (Énfasis suplido).

A base del citado texto, el Tribunal concluye que debido a que "comúnmente" las negociaciones entre el propietario y el corredor se formalizan mediante contratos sujetos a un término fijo, el legislador  quiso establecer que todo contrato de corretaje contenga una disposición a esos efectos.  De igual forma, presume que la Asamblea Legislativa no hubiera aprobado la referida enmienda si no hubiera entendido que por disposición de la Ley 10, todo contrato de corretaje, aun los de tipo abierto, requerían fecha de vencimiento como requisito para su validez.  Por consiguiente, de una mención general y ejemplificativa plasmada en una enmienda, el Tribunal deduce, livianamente, que el legislador tuvo la intención de que el artículo 31 (9) de la Ley 10 aplicara a los contratos abiertos, incluso desde su aprobación en 1994.  No comparto este método de interpretación que se trasluce de la opinión del Tribunal.

Es cierto que a través de la referida enmienda la Asamblea Legislativa prohibió las cláusulas de renovación automática.  Sin embargo, no es menos cierto que, como cuestión de lógica, ello no excluye que las partes –en el ejercicio de su libertad contractual– suscriban un contrato abierto sin estar sujeto a un término fijo.

Cabe destacar que la referida enmienda  fue  aprobada con posterioridad a la suscripción del contrato de autos,

hecho reconocido por la Opinión mayoritaria. Si bien no existe impedimento para considerar una legislación posterior con el fin de interpretar el alcance de una legislación anterior, "una expresión contenida en una ley enmendatoria [sic] explicando cuál fue la intención legislativa al aprobar la ley objeto de enmienda no es definitiva con carácter retroactivo ni desvirtúa la interpretación que a la ley original haya dado este Tribunal". *Morales v. Adm. Sistemas de Retiro*, 123 D.P.R. 589, 596 (1989); *Nadal v. Depto. Rec. Nat.*, 150 D.P.R. 715 (2000). De forma análoga, una expresión ejemplificativa contenida en la Exposición de Motivos de una ley enmendadora, refiriéndose a uno de varios supuestos contractuales cobijados por la ley original, no debe utilizarse como punta de lanza para realizar modificaciones con carácter retroactivo, o pasar por alto la claridad del texto legislativo.

El curso interpretativo que traza el Tribunal, sin más, no es fundamento adecuado para el resultado propuesto. Tanto la Ley 10 como sus antecedentes, demuestran que la Asamblea Legislativa y los distintos organismos del Ejecutivo han optado por excluir los contratos de corretaje abierto en todas las instancias en que se ha requerido desglosar tanto sus términos y condiciones como la fecha de vencimiento. Parecería más razonable, a mi juicio, como técnica interpretativa, que concluyésemos que el legislador eximió a los contratos de corretaje de carácter abierto del requisito de fecha de vencimiento.

En ausencia de fundamentos jurídicos adecuados, este Tribunal no debe excederse en el ejercicio de su función interpretativa del Derecho. Concluir que el texto del artículo 31(9) -según su redacción actual- fue aprobado con la intención de que aplicara a los contratos de corretaje abierto no es más que un ejercicio de legislación judicial.

Por los fundamentos antes expresados, disiento del criterio mayoritario.


                            Anabelle Rodríguez Rodríguez
                                   Juez Asociada